IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOE RAYMOND CASTILLO,

    Plaintiff,                      No. CIV S-04-0737 GEB GGH P

    vs.

NOBLE DASHIELL, et al.,

    Defendants.                FINDINGS & RECOMMENDATIONS

_____/

I. Introduction

        Plaintiff is proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983. This action is proceeding on the amended complaint filed May 20, 2005. Plaintiff alleges that defendants acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment. In particular, plaintiff alleges that defendants provided inadequate medical care regarding a detached retina in his right eye.

        Pending before the court is the summary judgment motion filed June 26, 2006, on behalf of defendants Dashiell, Lai, Pagaduan and Shepard. In the opposition filed July 13, 2006, plaintiff states that he will voluntarily dismiss all claims against defendant Shepard. Plaintiff also states that he will voluntarily dismiss his claims against defendant Pagaduan based on his alleged failure to adequately train his staff. Plaintiff will pursue only his Eighth Amendment

1

claim against defendant Pagaduan as a treating physician.

On July 27, 2006, oral argument was held regarding defendants' motion. After carefully considering the record, the court recommends that defendants' motion be granted in part and denied in part.

II. <u>Summary Judgment Standards Under Rule 56</u>

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id.</u> Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>See id.</u> at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." <u>Id.</u> at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. <u>See</u>

1  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356
2  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may
3  not rely upon the allegations or denials of its pleadings but is required to tender evidence of
4  specific facts in the form of affidavits, and/or admissible discovery material, in support of its
5  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,
6  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is
7  material, i.e., a fact that might affect the outcome of the suit under the governing law, see
8  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.
9  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the
10  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the
11  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

12           In the endeavor to establish the existence of a factual dispute, the opposing party
13  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the
14  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing
15  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary
16  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a
17  genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.
18  56(e) advisory committee's note on 1963 amendments).

19           In resolving the summary judgment motion, the court examines the pleadings,
20  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if
21  any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,
22  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the
23  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.
24  at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's
25  obligation to produce a factual predicate from which the inference may be drawn.  See Richards
26  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

(9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

III.  Undisputed Facts

The following facts are undisputed.  The court will cite from the record where the facts are found.

Plaintiff suffered from pre-existing ophthalmological disorders prior to his incarceration at the California Youth Authority (CYA), which began in October 2001.  Defendants' Exhibit E, ¶ 5.  These conditions included chronic bilateral anterior uveitis of unknown etiology; anisometropia associated with high myopia, secondary amblyopia, and cataract all involving plaintiff's right eye.  Id.

On July 8, 2002, plaintiff submitted a sick call request stating that his left eye was getting red.  Plaintiff's Exhibit A, p. 296.  On July 12, 2002, defendant Dashiell saw plaintiff for complaints of left-eye pain and three days of eye redness.  Defendants' Exhibit C, ¶ 11.  Defendant Dashiell reviewed plaintiff's history which revealed a history of cataract with no evaluation in two years.  Id.  Defendant diagnosed plaintiff with mild conjuntivitis hyperemia.  Id.  Defendant prescribed Sulfacetamide Sodium solution four times per day to the left eye.  Id.

A medical entry for July 12, 2002, by Nurse Cooper states that plaintiff's right eye had a cataract and a vision of 20/200.  Plaintiff's Exhibit A, p. 295.

On July 23, 2002, defendant Dashiell saw plaintiff again for recurring conjuntivitis.  Id., ¶ 12.  Defendant prescribed intermittent use of Tetrahydralyzine.  Id.  Defendant also wrote in plaintiff's records for that date, "Blind Rt eye –long cataract."  Plaintiff's Exhibit A, p. 292.  Defendant referred plaintiff to be seen as soon as possible by Dr. Zeiter, the opthalmologist who had given plaintiff pre-CYA care.  Defendants' Exhibit C, ¶ 12.

\\\\\

1            On July 31, 2002, plaintiff Dr. Zeiter saw plaintiff.  Plaintiff's Exhibit A, p. 421.
2  Dr. Zeiter's record states that the reason for the consultation was "blind rt eye cataract" and
3  "chronic injection left conjunctivitis."  Id.  Dr. Zeiter noted finding anisometropis, amblyopia and
4  myopia.  Id.  Dr. Zeiter concluded that plaintiff needed glasses and recommended as such.  Id.
5            On August 2, 2002, defendant Dashiell saw plaintiff for complaints of pink eye in
6  his left eye.  Plaintiff's Exhibit A, p. 151.  Defendant noted that plaintiff's left eye was reddened
7  and his right eye clear.  Id.  Defendant requested that plaintiff be seen by an ophthalmologist for a
8  consultation.  Id.
9            On August 8, 2002, optometrist Dr. Pontius saw plaintiff.  Plaintiff's Exhibit A, p.
10  418.  Dr. Pontius noted that plaintiff needed glasses, had a history of right-eye cataract, had right
11  eye ambloyopia and left eye myopa.  Id.  Dr. Pontius also wrote that plaintiff said that he had
12  always had poor visual acuity in his right eye.  Id.
13           On September 14, 2002, plaintiff submitted a sick call request stating, "My right
14  eye just went all black."  Plaintiff's Exhibit A, p. 146.  Plaintiff wrote that he suspected that this
15  was caused by the worsening of his cataract.  Id.  A chart note by Nurse Larsen on September 14,
16  2002, states, "ward states unable to see out of right eye, except peripheral vision.  Right eye with
17  cataract.  Left vision intact."  Id., p. 285.
18           In his declaration, defendant Dashiel states that on or about September 19, 2002,
19  he and Dr. Zeiter discussed the results of Dr. Zeiter's examination of plaintiff.  Defendants'
20  Exhibit C.  According to defendant Dashiell, Dr. Zeiter told him that there was no hope for
21  plaintiff's blind right eye cataract and there was no further treatment available for plaintiff's right
22  eye problem.  Id.
23           On September 19, 2002, defendant Dashiell met with plaintiff to discuss the
24  results of the examination by Dr. Zeiter.  Id., p. 285. Plaintiff requested miracle treatment, and
25  defendant Dashiell told him that none was available.  Id.  At that time, plaintiff refused glasses.
26  Id.  Defendant Dashiell did not perform an ophthalmological examination of plaintiff at this time.

5

Id. (It is likely that plaintiff suffered his later diagnosed retinal detachment at this time.)

On September 26, 2002, plaintiff was seen by Dr. Pontius again, per a request by defendant Dashiell. Defendants' Exhibit C, ¶ 21. Dr. Pontius recorded a visual acuity of no light perception in plaintiff's right eye, along with a cataract and high myopia. Defendants' Exhibit E, ¶ 6. Dr. Pontius' inability to see the retina was attributed to the presence of a dense cataract. Id. The historical severe amblyopia in the right eye prompted Dr. Pontius to recommend a conservative approach to management only, because cataract surgery would be of no visual benefit in his opinion. Id.

On October 3, 2002, defendant Pagaduan saw plaintiff. Plaintiff's Exhibit A, p. 283. Defendant Pagaduan noted that plaintiff had a right eye cataract, he had lost his glasses and his last recheck had occurred on September 26, 2002. Id.

On October 29, 2002, defendant Pagaduan saw plaintiff. Id. Defendant Pagaduan's entry states that on this date, plaintiff told him that he was blind in his right eye as long as he could remember. Id.

On December 28, 2002, plaintiff was seen by defendant Pagaduan and two nurses in response to a sick call request. Id., p. 278. The response to this request stated that plaintiff was suffering from right eye problems and needed to see a doctor for his eye. Id.

On April 2, 2003, plaintiff submitted a sick call request regarding his eyes. Id., p. 273. On April 9, 2003, Nurse Fuller wrote that plaintiff wanted a referral to an ophthalmologist. Id.

On April 9, 2003, plaintiff submitted another sick call request regarding his eyes. Id., p. 200. On April 13, 2004, defendant Lai responded to this request, writing that plaintiff should refrain from sports and physical education for a period of time due to eye problems. Id.

On April 14, 2003, defendant Pagaduan saw plaintiff for his request to see an eye doctor. Defendants' Exhibit B, ¶ 10. Defendant noted that plaintiff had a right eye cataract and referred plaintiff to an eye doctor for glasses. Plaintiff's Exhibit A, p. 273.

In May 2003, plaintiff submitted a sick call request, apparently again complaining about his eyes. Id., p. 272. Nurse Fuller responded defendant Padaguan had referred plaintiff to an eye doctor. Id.

On June 17, 2003, Dr. Pontius again saw plaintiff. Defendants' Exhibit B, ¶ 12. Dr. Pontius recommended that plaintiff be referred to an opthalmologist. Id. On June 19, 2003, defendant Padaguan referred plaintiff to an opthamologist. Id., ¶ 13.

On June 23, 2003, plaintiff was seen by Dr. Serdahl, an opthalmologist. Plaintiff's Exhibit A, p. 408. Dr. Serdahl diagnosed plaintiff with a retinal detachment in his right eye. Id. Dr. Serdahl determined that plaintiff needed a consultation with a retinal specialist. Id.

On June 23, 2003, defendant Padaguan referred plaintiff to a retinal specialist. Defendants' Exhibit B, ¶ 15.

On July 7, 2003, plaintiff was seen by Dr. Kelly, the retinal specialist. Defendants' Exhibit D, ¶ 8. Later that day, after his return to custody, defendant Lai saw plaintiff. Id. It was defendant Lai's understanding that plaintiff had a small retinal detachment in his right eye. Id. Defendant Lai's treatment plan for plaintiff was for plaintiff to return to the dorm and no physical education or contact sports until further notice. Id.

On July 10, 2003, plaintiff underwent surgery at Mercy General Hospital in Sacramento. Plaintiff's Exhibit A, p. 401. The preoperative diagnosis for plaintiff was "traumatic retinal detachment and cataract." Id. The post operation consisted of a "pars plana lensectomy, vitrectomy, membranectomy and retinectomy with Perfluoron, silicone oil and laster photocoagulation, [in the] right eye." Id. The postoperative diagnosis was "traumatic retinal detachment and cataract, proliferative vitreoretinopathy, and giant retinal tear." Id.

On September 19, 2003, plaintiff underwent a second surgery at Mercy General Hospital in Sacramento. Id., p. 391-92. Dr. Kelly noted in his operative report that he could see that the retina was "hopelessly detached." Id. As a result of the severe detachment, he "elected

1  not to make further attempts to reattach the retina, because [he] had done everything [he] could in
2  the previous operation." Id.
3  IV. <u>Legal Standard for Eighth Amendment Claim for Inadequate Medical Care</u>
4          In order to state a § 1983 claim for violation of the Eighth Amendment based on
5  inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence
6  deliberate indifference to serious medical needs." <u>Estelle v. Gamble</u>, 429 U.S. 97, 106, 97 S. Ct.
7  285, 292 (1976). To prevail, plaintiff must show both that his medical needs were objectively
8  serious, and that defendants possessed a sufficiently culpable state of mind. <u>Wilson v. Seiter</u>,
9  501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); <u>McKinney v. Anderson</u>, 959 F.2d 853 (9th Cir.
10 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference."
11 <u>Hudson v. McMillian</u>, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).
12         A serious medical need exists if the failure to treat a prisoner's condition could
13 result in further significant injury or the unnecessary and wanton infliction of pain. Indications
14 that a prisoner has a serious need for medical treatment are the following: the existence of an
15 injury that a reasonable doctor or patient would find important and worthy of comment or
16 treatment; the presence of a medical condition that significantly affects an individual's daily
17 activities; or the existence of chronic and substantial pain. <u>See</u>, e.g., <u>Wood v. Housewright</u>, 900
18 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); <u>Hunt v. Dental Dept.</u>, 865 F.2d 198, 200-01
19 (9th Cir. 1989). <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059-60 (9th Cir. 1992), <u>overruled on other</u>
20 <u>grounds</u>, <u>WMX Technologies v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997) (en banc).
21         In <u>Farmer v. Brennan</u>, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court
22 defined a very strict standard which a plaintiff must meet in order to establish "deliberate
23 indifference." Of course, negligence is insufficient. <u>Farmer</u>, 511 U.S. at 835, 114 S. Ct. at 1978.
24 However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm
25 which is so obvious that it should be known) is insufficient. <u>Id.</u> at 836-37, 114 S. Ct. at 1979.
26 Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

should have known of the risk. Id. at 842, 114 S. Ct. at 1981.

It is nothing less than recklessness in the criminal sense—a subjective standard—disregard of a risk of harm of which the actor is actually aware. Id. at 838-842, 114 S. Ct. at 1979-1981. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S. Ct. at 1979. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Id. at 842, 114 S. Ct. at 1981. If the risk was obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42, 114 S. Ct. at 1981. However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation. Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

Moreover, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. Id.

Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm. McGuckin, 974 F.2d at 1060, citing Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-1000. A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the

inquiry. McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant." McGuckin, 974 F.2d at 1061.

V. Discussion

It is undisputed that plaintiff suffered from a serious medical need. Also not disputed in this motion is the primary causation issue, i.e., assuming deliberate indifference, the delay in plaintiff's surgery caused the retina to be irretrievably harmed.[1] Defendants argue that they are entitled to summary judgment because they did not act with deliberate indifference to this serious medical need.

The court first considers the claims against defendant Dashiell. The issue is whether defendant Dashiell acted with deliberate indifference to plaintiff's right eye problems in September 2002 after plaintiff reported that his right eye suddenly went black.

Defendants do not dispute that when a patient complains of having gone blind in one eye, an urgent or emergency referral to an ophthalmologist is warranted. Defendants' Exhibit F, ¶ 9; Defendants' Exhibit E, ¶ 9. According to defendants' expert, Dr. Salzano, defendant Dashiell did not realize the emergency nature of the situation because there was a generalized perception that plaintiff's right eye was already blind.

While defendants' expert, Dr. Salzano, states that defendant Dashiell failed to properly treat plaintiff based on a misperception that his right eye was already blind (defendants' exhibit E, ¶ 9), defendant Dashiell's own declaration does not state this. Defendant Dashiell does not state why he disregarded plaintiff's complaint of recent total blindness. Nor does the record clearly indicate that the cataract in fact caused plaintiff to suffer total blindness. Plaintiff's representation that his eye had just gone totally blind suggested that the cataract had

---

[1] Defendants argue a supervisory causation issue, but such is different from the primary causation component of plaintiff's case.

not previously caused him to suffer total blindness.  For these reasons, the court cannot find that defendant Dashiell did not act with deliberate indifference when he failed to treat plaintiff's medical problem as an emergency and refer plaintiff to an opthamologist on September 19, 2002.  In reaching this conclusion, the court observes that defendants' own expert, Dr. Salzano, stated that "[i]t is my professional opinion that the community standard of care in regards to this problem was not achieved."  Defendants' Exhibit E, ¶ 9.

Defendants also suggest that because defendant Dashiell did not refuse to treat plaintiff, and in fact provided some treatment, he should be granted summary judgment.  It is true that this case presents facts out of the ordinary.  Usually, a plaintiff's allegations center about a complete ignoring or brush-off of medical complaints which should have been taken seriously.  In this case, none of the defendant physicians, including Dr. Dashiell, evidenced over a period of time a callous attitude or complete brush-off.  But as stated above, a failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  Ortiz v. City of Imperial, 884 F.2d at 1314.  Taking all inferences in plaintiff's favor, defendant Dashiell provided some treatment, but he failed to competently treat plaintiff's serious medical condition.  Based on the evidence that plaintiff's complaint of sudden total blindness warranted urgent opthamological treatment, the court cannot find that defendant Dashiell's conduct was not deliberately indifferent as a matter of law.

Finally, on summary judgment, there is a battle of the experts.  Defendant Dashiell's experts opine that the care under question was below the standard of care, but not deliberately indifferent.  Plaintiff's expert asserts a bare opinion, but an opinion nevertheless, that deliberate indifference was involved.  This issue of fact alone requires a trial.

For these reasons, defendant Dashiell should not be granted summary judgment.

Turning to defendant Pagaduan, no evidence has been presented indicating that defendant Pagaduan knew that plaintiff's right eye had suddenly gone blind in September 2002.  In fact, plaintiff told defendant Pagaduan during their second meeting in October 2002 that his

right eye had been blind as long as he could remember. Unless defendant Pagaduan had knowledge of plaintiff's sudden blindness, he had no reason to suspect that plaintiff required urgent opthamological attention.

The record indicates that defendant Pagaduan reasonably believed that plaintiff's complaints regarding his right eye were caused by cataracts. In April 2003 defendant referred plaintiff to optometrist, Dr. Pontius. In June 2003 defendant referred plaintiff to an ophthalmologist at the recommendation of Dr. Pontius. Defendant Pagaduan went on to refer plaintiff to a retinal specialist at the recommendation of the ophthomologist. Defendant Pagaduan's actions do not evidence deliberate indifference.

Plaintiff first saw defendant Lai on April 13, 2004, in response to a sick call request regarding his eyes. In this request plaintiff wrote, "I was told by Sandy to write a sick call to get my blue slip renewed if I haven't finished seeing my eye doctor, and I am scheduled to go to see my doctor. I don't know when though." Plaintiff's Exhibit A, p. 2000. In response, defendant Lai apparently extended plaintiff's blue slip and wrote that plaintiff should refrain from sports and physical education for three months. This particular interaction between defendant Lai and plaintiff does not demonstrate deliberate indifference. No evidence has been presented suggesting that defendant Lai knew of plaintiff's sudden blindness at this time.

Plaintiff next saw defendant Lai on July 7, 2003, after having been examined by retinal specialist Dr. Kelly. At that time, defendant Lai directed plaintiff to return to his dorm and have no physical education or contact sports until further notice. Plaintiff underwent his first surgery three days later. Defendant Lai's July 7, 2003, order that plaintiff have no physical education or contact sports until further notice does not demonstrate deliberate indifference. By this time, plaintiff's retinal detachment had been diagnosed and plaintiff was scheduled for surgery. Accordingly, defendant Lai should be granted summary judgment.

IT IS HEREBY RECOMMENDED that defendants' June 26, 2006, summary judgment motion be denied as to defendant Dashiell, but granted as to defendants Lai and

Pagaduan.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:   2/27/07

/s/ Gregory G. Hollows
_____
GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

cas737.sj